## A08A0673. WRIGHT v. THE STATE.
(665 SE2d 374)

ADAMS, Judge.

Richard Raynard Wright was indicted for the offenses of aggravated stalking, aggravated assault (family violence act) and simple battery and found guilty by a jury of aggravated stalking. He appeals following the denial of his motion and amended motions for new trial, challenging the sufficiency of the evidence to support his conviction. For the reasons set forth below, we find the evidence was insufficient in this case, and reverse.

Viewed so as to support the verdict, the evidence adduced at trial shows the following. Wright and the victim in this case, Valerie Harrison, have a long history together, going back to the 1980s. They married in the mid-1990s and divorced in 2001. They have two daughters; Wright also has an older son who was living with Harrison at the time of the incident giving rise to the charges here.

In October 2000, Harrison, alleging that Wright had made repeated verbal threats against her, petitioned the court for a temporary protective order. Over the next three months, Harrison reported three occasions where she claimed that Wright had violated the protective order and she was subsequently granted a permanent

order against Wright in January 2001. In March 2001, Wright was charged with two counts of aggravated stalking for contacting Harrison in violation of the permanent protective order. Wright subsequently pled guilty to these charges and a condition of his probation was to "[h]ave no direct or indirect contact with Valerie Harrison. . . ."

Between 2001 and 2003, after they were divorced, Harrison maintained an "on and off" relationship with Wright. In November 2002, Harrison took steps to vacate her permanent protective order against Wright, and following a hearing, the order was vacated in December 2002. On May 16, 2003, Harrison submitted a sworn affidavit to the court stating that she wanted to have the no contact condition of Wright's probation revoked and that she would take the "necessary steps to do whatever [she] had to do . . . to be able to have contact with each other." However, in June 2003, Harrison alleged that Wright demanded sex and forced himself on her when she refused. Following this incident, Wright pled guilty to misdemeanor sexual battery and misdemeanor obstructing or hindering persons making emergency telephone calls. Wright was sentenced to 24 months, the majority to be served on probation; a condition of his probation was "[d]o not contact or visit the residence of Valerie Harrison."

In 2005, Wright and Harrison again resumed consensual contact in violation of Wright's condition of probation. Wright and Harrison had frequent communications and Wright was going back and forth daily between Atlanta where he was working and Gainesville where Harrison lived with the children. In July 2005, Harrison, Wright and the children went to a mall in Atlanta. In August, Harrison, Wright, his mother and the children went to Atlanta to collect and cash Wright's paycheck. Wright's mother deposited the check into her account and gave Wright some of the cash. They all went out to lunch and Wright, Harrison and the children went to a hotel. Wright gave Harrison approximately $400 from his check.[1]

Several days later, Wright called Harrison multiple times and the two argued back and forth about the money. Harrison testified "that's what the whole conversation was about every time he called." Wright had spent the day with his older son and apparently was sleeping in his son's car at the time, so he also asked Harrison if she would let him take a shower at her house. Harrison testified she was angry with Wright and did not want him to come to her house, but their daughters "pretty much begged" her to let him shower at

---

[1] There is no evidence as to why he gave her the money but she refers to it as "his money" in her testimony.

their house so she eventually relented and agreed he could take a shower there.

Later that night, Harrison was at home with two friends, Mike Turner and Kay Reid. Turner and Reid testified they observed Wright drive by the house, but he did not stop. Turner testified that at some point Wright knocked on the front door and Turner answered. Wright asked Turner where his son was and Turner told him that he was across the street at his house. At some point Wright also knocked on a window. Reid testified that around midnight, Wright returned and knocked loudly on the front door. Harrison told him to leave because the children were sleeping and she did not want to wake them up.

Wright knocked on Harrison's door again somewhere between 12:30 a.m. and 1:00 a.m. Harrison opened the door without asking who it was because she thought it was Wright's son. Harrison asked Wright what he wanted but did not immediately tell him to leave. She knew that Wright wanted his money back, but she did not know if he still wanted to take a shower. Wright demanded his money and accused Harrison of doing drugs with her friends in the back bedroom while their daughters were asleep on the couch. Harrison testified she believed Wright was under the influence of drugs because he was breathing heavily, sweating and his eyes were really big.

Wright and Harrison began "fussing" and "going back and forth" about the money from Wright's paycheck. Wright forced his way past Harrison into her home. Harrison told Wright "just leave, I don't want you here, why are you here anyway, I'm not giving you your money, just leave." Wright pushed Harrison and grabbed her by the shirt and she pushed him back. Harrison went into the kitchen and picked up a hammer and verbally threatened Wright. Wright wrestled the hammer away and verbally threatened Harrison. During the struggle, Harrison lost her balance and fell backwards onto the couch where their daughters were sleeping.

On direct, Harrison did not testify that she was afraid of Wright, but on cross-examination she testified that she had a split second of fear that he might hit her with the hammer after he wrestled it away from her. But she further testified that she did not think he would hurt her and agreed instead with defense counsel's characterization of the incident as "a battle of will and anger." About a minute or so after Wright got the hammer away from Harrison, Turner and Reid came out of the back bedroom and tried to separate them. Reid restrained Harrison and told her to go to the back bedroom; Turner restrained Wright and told him to leave. Wright left and took the hammer with him, but Harrison continued to struggle with Reid, trying to get away from her. Harrison testified that she was "just so

mad" that she attempted to follow Wright, but by the time she broke free from Reid and left the house, Wright was "long gone." Harrison flagged down a police officer who happened to be riding by on patrol and filed a report about the incident.

Aggravated stalking is committed when a person "in violation of a . . . condition of probation . . . follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person." OCGA § 16-5-91 (a).

> For the purposes of this article the term "harassing and intimidating" means a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose. This Code section shall not be construed to require that an overt threat of death or bodily injury has been made.

OCGA § 16-5-90 (a) (1).

Wright argues the evidence was insufficient because Harrison consented to having contact, the contact was for legitimate purposes and Harrison was never in reasonable fear for her safety.

We agree that the evidence failed to establish that Wright's actions that night placed Harrison in reasonable fear for her safety by establishing a pattern of harassing and intimidating behavior. Rather, by her own testimony, the evidence shows that following a recent pattern of consensual contacts, Harrison and Wright began arguing over the return of "his money" and they were becoming increasingly angry with each other. There is no evidence that Harrison was in reasonable fear for her safety during their multiple phone conversations; on the same day that Wright was charged with stalking her, Harrison gave consent for Wright to use her shower. Harrison revoked the consent for Wright to enter her home later that night,[2] but she testified that she only felt fear for a moment when Wright wrestled the hammer that she had been threatening him with away from her. However, even then she did not think he would hurt her or their children, and she never called for help from the other adults in the home. Moreover, even after the two other adults separated Harrison and Wright and Wright left the residence *with*

---

[2] Evidence that Wright pushed his way past Harrison into the home likely would have been sufficient to establish the offense of misdemeanor criminal trespass, the lesser included charge to the jury in this case. See OCGA § 16-7-21.

*the hammer*, Harrison was still mad and broke free of her friend who was restraining her and went after Wright.

Because the evidence here, including Harrison's prior statements and the testimony from other witnesses,[3] failed to establish that Wright was engaged in a pattern of intimidating and harassing behavior that placed Harrison in reasonable fear for her safety, Wright's conviction for the offense of aggravated stalking must be reversed. See *Bragg v. State*, 285 Ga. App. 408, 410 (1) (646 SE2d 508) (2007); see also *Pilcher v. Stribling*, 282 Ga. 166, 167 (647 SE2d 8) (2007).

*Judgment reversed. Smith, P. J., and Mikell, J., concur.*

DECIDED JULY 10, 2008.

*Watson & Watson, Anne L. Watson, Sidney O. Smith III*, for appellant.

*Lee Darragh, District Attorney*, for appellee.

---

[3] Compare *Peek v. State*, 259 Ga. App. 13 (576 SE2d 31) (2002).