## A08A2217. SINCLAIR v. DALY.
(672 SE2d 672)

DOYLE, Judge.

Following an evidentiary hearing, the trial court issued a stalking protective order enjoining David L. Sinclair from contacting or harassing Joseph E. Daly. Sinclair appeals, and we reverse because there was no evidence that Sinclair's behavior placed Daly in reasonable fear for his safety.

Evidence adduced at the May 1, 2008 hearing on Daly's motion for a stalking protective order showed that Daly had served as the priest of Saint Andrews Episcopal Church for the previous five years. Sinclair was a longstanding member of the church and served as the organist. During the course of their relationship, Sinclair disclosed to Daly that he was struggling with the consumption of alcohol, that he was selectively taking medications related to a mental health condition, and that he was suicidal.

The relationship between Daly and Sinclair began to sour following the construction and installation of a new pulpit. Afterward, according to a member of the church's vestry, Daly "could do no right in [Sinclair's] eyes." Sinclair told Daly that the priest was concerned only for himself and not the parish and that Daly was "jealous of the organ." Sinclair made a series of late-night telephone calls during which, according to Daly, he would "go[ ] on." The telephone calls stopped after another parishioner told Sinclair that "he was being a pest," but Sinclair's behavior "flared up again," according to Daly, when he came into Daly's office, interrupting a meeting, to insist that the church order a series of choir books. Two days later, Sinclair sent an e-mail to members of the parish, listing those services at which he would continue to play and those at which he would no longer play.

In an attempt to clarify Sinclair's terms of service, Daly and two church wardens called a meeting with Sinclair on November 28, 2007. Before the meeting, Daly prepared a document to be signed by Sinclair, the wardens, and Daly, providing that Sinclair, as organist, "shall serve at all scheduled religious services," and that "[t]he organist shall maintain all medically prescribed health treatments and abstain from all consumption of alcohol." The document was presented to Sinclair at the meeting, and he reacted negatively. Sinclair eventually walked out of the meeting despite being told that doing so would amount to his resignation. Either that evening or early the next morning, Sinclair removed his belongings from the

church.

Daly subsequently wrote Sinclair a letter thanking him for his services and informing him that the church would honor a check it had issued to Sinclair to pay for organ lessons. The next day, Daly found the check placed on his desk, and Daly believed Sinclair had entered his locked office using a key he had been previously issued. In February 2008, Daly met with Sinclair, who maintained that he had been wrongfully dismissed and that he was going to sue Daly in civil court, as well as pursue an ecclesiastical court trial to have Daly defrocked.

In early April 2008, Sinclair confronted Daly at the church as Daly was being vested for a service. Sinclair asked Daly to arrange a meeting, and Daly agreed. During the same conversation, Sinclair informed Daly that he would interfere with Daly's sabbatical and "tie [him] up in court" if Daly did not put him back on the organ. Two days later, Sinclair sent Daly an e-mail indicating that Sinclair intended to proceed with legal action, but that "there [was] still time for [him] to avoid a situation that [would m]ost likely be damaging to [his] career." The church's vestry decided to send Sinclair a "trespass warning" informing him not to come near Daly's house[1] or near the church, but Sinclair refused to accept the warning when it was physically delivered to him.

On April 15, 2008, Daly obtained an ex parte temporary protective order enjoining Sinclair from harassing or intimidating him. That same day, Daly filed a motion for a permanent stalking protective order. The trial court issued the permanent stalking protective order on May 1, 2008, following an evidentiary hearing.

Sinclair contends that Daly failed to establish the elements of the offense of stalking by a preponderance of the evidence and that the trial court therefore abused its discretion in granting the petition for a stalking protective order. We agree.

> In order to obtain a protective order based on stalking, the petitioner must establish the elements of the offense by a preponderance of the evidence. The grant or denial of a motion for protective order generally lies within the sound discretion of the trial court, and will not be reversed absent an abuse of that discretion.[2]

---

[1] Notwithstanding this request, there is no evidence that Sinclair had physically contacted Daly at his house, nor was there any evidence that Sinclair had followed Daly or placed him under surveillance.

[2] (Citations and punctuation omitted.) *Pilcher v. Stribling*, 282 Ga. 166, 167 (647 SE2d 8) (2007). See OCGA § 16-5-94 (a) ("[a] person . . . who alleges stalking by another person may seek a restraining order by filing a petition alleging conduct constituting stalking as defined in [OCGA] § 16-5-90").

As provided by OCGA § 16-5-90 (a) (1), "[a] person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person."[3] For purposes of the offense,

> "harassing and intimidating" means a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.[4]

In light of the foregoing, in order to show that Sinclair was stalking Daly, the evidence must show "that [Sinclair's] actions . . . placed [Daly] in reasonable fear for [his] safety by establishing a pattern of harassing and intimidating behavior."[5] Daly did not, however, testify that Sinclair's actions caused him to fear for his safety.[6] Rather, according to Daly, he was concerned with Sinclair because "my time was being taken up," and because "if [Sinclair] was suicidal, if he was willing to do violence to himself, would he do violence to me or my family?" Because the offense of stalking is premised upon behavior,[7] we cannot conclude that Daly's concern with Sinclair's alleged mental condition was sufficient to establish that Sinclair's *actions* had placed Daly in reasonable fear for his safety.

---

[3] OCGA § 16-5-90 (a) (1).

[4] Id.

[5] *Wright v. State*, 292 Ga. App. 673, 676 (665 SE2d 374) (2008). See *Pilcher*, supra at 168 (verbal taunting by fire chief during working hours, including " 'cursing, threatening employees' jobs, and belittling employees' intelligence, personal life, weight, sexual inexperience or financial situation,' " was not sufficient to place employees in reasonable fear for their safety and did not fall within the statutory definition of stalking).

[6] See *Wright*, supra (evidence failed to show defendant stalked his ex-wife because, although the defendant entered his ex-wife's house after she revoked his consent to do so, her testimony showed that she did not think he would hurt her or their children); *In the Interest of C. C.*, 280 Ga. App. 590, 592 (1) (634 SE2d 532) (2006) (evidence insufficient to establish crime of stalking where, among other things, the alleged victim and his wife did not testify that they were afraid when a truck in which the defendant was a passenger pulled into their driveway and remained in front of their house).

[7] See, e.g., *Benton v. State*, 256 Ga. App. 620, 621 (1) (568 SE2d 770) (2002) ("[t]he relevant elements of stalking are: following, placing under surveillance, or contacting another person without the consent of the other person for the purpose of harassing and intimidating him or her").

Sinclair threatened to sue Daly on several occasions, but no reasonable person would have feared for his safety, or that of his family, due to the threatened lawsuits,[8] nor did Daly represent that he feared for his safety on this account. Although Daly testified that Sinclair's demeanor was "hostile and assertive" and he "could smell the presence of alcohol on him" when Sinclair confronted him at the church in April 2008, when asked how the confrontation made him feel, Daly responded "I was just wearied. . . . [I]t was interfering with the life of the parish." With regard to the late-night telephone calls and e-mails, pretermitting whether they can be characterized as without legitimate purpose,[9] Daly did not testify that they caused him to fear for his safety.

Our review of the record shows no evidence that Sinclair engaged in a pattern of intimidating and harassing behavior that placed Daly in reasonable fear for his safety. It follows that the trial court abused its discretion in granting the stalking protective order.[10]

*Judgment reversed. Andrews, P. J., and Bernes, J., concur.*

DECIDED JANUARY 21, 2009.

*Patrick S. Ferris*, for appellant.
*Michael W. Gowen*, for appellee.

---

[8] See generally *Rolleston v. Huie*, 198 Ga. App. 49, 51 (2) (400 SE2d 349) (1990) ("threats associated with institution of a civil action cannot and do not constitute duress") (punctuation and emphasis omitted).

[9] See *Pilcher*, supra at 166-167 (noting that alleged harassing and intimidating conduct took place during basketball games that were initiated for the legitimate purpose of physical training).

[10] See id.