**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 21, 2013**

# In the Court of Appeals of Georgia

A13A0332. GATES v. THE STATE.

McMILLIAN, Judge.

Brandon Keith Gates was convicted by a jury of one count of aggravated stalking and was sentenced to ten years in confinement.[1] He appeals, arguing in his sole enumeration of error that the evidence was insufficient to support his conviction. We affirm.

"On appeal the evidence must be viewed in the light most favorable to support the verdict, and [Gates] no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. The verdict must be upheld if any rational trier of fact

---

[1] The jury acquitted Gates of two counts of criminal trespass.

could have found the essential elements of the crime beyond a reasonable doubt." *Bradley v. State*, 252 Ga. App. 293 (556 SE2d 201) (2001).

So viewed the evidence shows that on December 24, 2009, the victim was living in a house with a female roommate in a house at 800 Vernon Ferry Road in Troup County. The victim and Gates had been engaged in an "on and off" dating relationship since 2005. The victim testified about several incidents where Gates became verbally or physically threatening or abusive. The victim attempted to end her relationship with Gates in 2006. He came to her residence and started knocking on her door and window; the victim was on the phone with her friend and told her to call 911. Gates kicked the door down and the victim attempted to run out the door but Gates pulled her back inside. The victim said that Gates also took her cell phone and keys so she could not leave.

The victim also testified about an incident in 2008 when Gates came to her place of employment and threatened to kill her. The victim said that she had to ask her co-workers to watch her go to her car and that her co-workers were scared to go to lunch with her because of the uncertainty over what Gates might do. The victim obtained a temporary protective order around the time of that incident; the protective order enjoined Gates from, among other things, having any contact with the victim

2

"including but not limited to telephone . . . email, mail or any other means of communication," approaching within 100 yards of the victim and engaging in harassing and intimidating acts toward the victim.

The victim also testified about another incident when Gates became angry with her because she did not want him to go with her to a cousin's wedding. On that occasion, he choked her and hit her in the eye, leaving visible marks. A photograph showing the marks on the victim's face was introduced into evidence at trial.

However, in July 2009, the victim agreed to go out to eat with Gates. The victim testified that she assumed Gates would not do anything to her since they were going to be in public, but then she realized that he wanted her to pick up food and go to his father's house. The victim, who was driving, said she told Gates that she was not going to go to his father's house, but he kept insisting that they go. Gates started hitting the victim, striking her five to seven times in her face and mouth. The victim stopped the vehicle and tried to run away, but Gates caught her, put her in a headlock and dragged her through traffic back across the street to the car. The victim first drove to Gates' mother's house but was subsequently able to get away after she convinced him that they should go to the store to get cigarettes and she escaped while he was in

3

the store. Pictures of the injuries the victim suffered during this incident were also introduced into evidence at trial.

Following this incident, the victim obtained another protective order. Several months after the order was put into place, the victim's cousin called her and she agreed to let him come to her house to play cards. She said that Gates was with her cousins when they arrived, and she stopped Gates at the door and asked him what he was doing there. She said she realized Gates had initiated the idea to come to her house, and she told him he did not have permission to be there. Gates attacked her, and the victim, her two cousins and her roommate removed Gates from the house.

The victim also testified about the December 2009 incident, which gave rise to the charges in this case. She said that Gates sent her text messages and then called her trying to persuade her to let him come over to her house. She said that she tried to convince him not to come, and she hung up on him but he called back. The victim also replied to Gates' text messages and told him that she was already in bed and did not want him to come to her house.

The victim said after she fell asleep Gates came to her residence in the early morning hours and started banging on the door. The victim's roommate went to the door and told Gates that the victim was asleep and would not let him in. Gates also

4

knocked on the victim's window. The roommate said she stayed in her bedroom and the victim said that she remained in bed and called 911 but did not speak with anyone because she fell back asleep. The next morning, the victim and the roommate discovered that some of the tires on their vehicles had been flattened, and they called law enforcement.

On cross-examination Gates elicited testimony from the victim that she continued to see Gates after she obtained the protective order. Gates also elicited testimony from various defense witnesses to the effect that the victim came to Gates' house and place of employment while the protective orders were in place and that she came to his house after the December 2009 incident. The victim testified she continued to see Gates so he would not come after her, but that she tried to avoid situations where she would be alone with him. The victim also reiterated during re-direct that she did not give him permission to come to her house on the night of the December 2009 incident.

Pursuant to OCGA § 16-5-91 (a), "[a] person commits the offense of aggravated stalking when such person, in violation of a . . . temporary [or permanent] protective order. . . contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other

person." The term "harassing and intimidating is defined in OCGA § 16-5-90 (a) (1) as

> a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety . . . by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose. This Code section shall not be construed to require that an overt threat of death or bodily injury has been made.

Gates points to the evidence showing that there were occasions when he and the victim had consensual contact and argues the evidence was insufficient because this evidence demonstrated that she did not feel harassed or intimidated by him. However, the evidence clearly showed that the victim did not consent to the contact for which Gates was prosecuted and her actions in refusing to admit him once he arrived at her house against her express wishes and her attempt to call 911 showed that she was in reasonable fear for her safety. Thus, viewing this and the other evidence presented at trial in the light most favorable to the verdict, we find the evidence was sufficient to authorize Gates' conviction of aggravated stalking under OCGA § 16-5-91 (a). E.g., *Crane v. State*, 297 Ga. App. 880 (678 SE2d 542) (2009) (finding evidence sufficient to support conviction for aggravated stalking

notwithstanding that the victim had consensual contact with the defendant on other occasions after restraining or protective order was entered); *Revere v. State*, 277 Ga. App. 393, 394 (1) (a) (626 SE2d 585) (2006) (same); *Littleton v. State*, 225 Ga. App. 900, 903 (4) (485 SE2d 230) (1997) (same). Compare *Wright v. State*, 292 Ga. App. 673 (665 SE2d 374) (2008) (evidence insufficient to show that victim was in reasonable fear for her safety when there had been a recent pattern of consensual contacts and victim pursued defendant after he left the residence even though he had the hammer he had taken away from her).

*Judgment affirmed. Andrews, P. J., and Dillard, J., concur.*