**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J., and BOGGS, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 20, 2015**

# In the Court of Appeals of Georgia

A15A0795. MORAN v. STATE OF GEORGIA

BOGGS, Judge.

Donald Moran appeals from his convictions of aggravated battery, aggravated assault, burglary, possession of a knife during the commission of a felony, and stalking. He asserts that the State presented insufficient evidence to support his convictions and that he received ineffective assistance of counsel. For the reasons explained below, we reverse his stalking conviction and affirm his remaining convictions.

When reviewing the sufficiency of the evidence,

the relevant question is whether, after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact

fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citations and footnotes omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the evidence shows that in July 2011, the male victim and Moran developed "somewhat of a friendship" based upon their mutual love of custom motorcycles. About a month later, Moran introduced his girlfriend, Kimberly Thomas, to the victim. After the couple later began spending a lot of time at the victim's home, which he shared with four other people, the victim and Thomas also developed a friendship. After witnessing arguments between Moran and Thomas over time, the victim had "a falling out" with Moran.

Thomas testified that Moran had "trust issues" that made it difficult for her to spend time with friends while he was her boyfriend. As a result of Moran's frequent accusations of cheating, Thomas would lie to him when she spent time with friends.

2

On November 18, 2012, Thomas told Moran after an argument that she would be having dinner with her father that evening. Earlier, Moran had "talked about going out that night." Thomas did not have plans for dinner with her father, however, and instead called the victim to give her a ride to a restaurant where they consumed alcohol. While Thomas was at the restaurant with the victim, she and Moran exchanged numerous text messages.

Through their text message exchanges, Moran informed Thomas that he knew she was not at the home she shared with her father by stating, "I will sit in your driveway till you come home. I'd like to meet your friends anyway." He also stated, "I think I'm going to wait till you come home and see who's driving." Moran further wrote, "if your telling the truth it shouldn't be long of a wait now since you been absent for a couple of hours," and "So are you gonna tell me the truth or not? Cause I can sit here n see if you dads gonna bring you home or I can just go out and swing by later to see if his car is there." In a period of approximately four hours, Moran sent 51 texts to which Thomas replied only 9 times. In her next-to-the-last text at 9:58 p.m., Thomas told Moran, "I don't want to talk to u."

Around 1:00 a. m., the victim drove Thomas back to her father's home. The victim went inside and followed Thomas to her room in the basement. He testified

3

that he fell asleep fully clothed on the corner of her bed while she was in the bathroom. He "awoke to a loud thud and yelling," and saw Thomas on the ground and Moran standing in front of him. By the time the victim stood up, Moran turned on him. The victim threw his guard up as Moran approached because he believed Moran was going to attack him. Moran "came to [him] person-to-person, body-to-body." They were locked together "chest-to-chest," when the victim felt his back get really warm and soaking wet. While the victim did not feel the first two or three stabs, he "could feel him, kind of, digging around in my back at one point." He let go of Moran when he started getting dizzy, and the two fell apart. The victim denied having Moran in a choke or sleeper hold before he was stabbed.

Moran and Thomas then began arguing about Moran's behavior, and the victim placed himself in between Moran and Thomas. During this time, Moran stabbed the victim in the knee and punched him in the face several times. Moran eventually calmed down, and the victim left the room to seek medical attention. His injuries included six puncture wounds in his upper back that required stitches, as well as knee and lip wounds that also required stitches.

Thomas testified that she was "black-out drunk" that evening, did not recall seeing Moran or the victim in her home, and did not recall most of what took place.

4

She could only remember "being in a lot of pain and . . . yelling at . . . [Moran and the victim]" and "being in a cop car." She did recall that Moran sent her text messages that evening and responding to some of them. However, she was never asked whether Moran's repeated and numerous text messages made her afraid for her safety.

She testified that at the time of the incident, her relationship with Moran "was really rocky" and they "were arguing almost every day." Moran was no longer allowed to come to her father's house based upon arguments her father witnessed. On one occasion, they were arguing and "ended up fighting a little bit and [her] dad came downstairs and chased [Moran] out of the house." The victim testified that she was "[a] little bit" afraid of Moran "when that argument was going on." After her father forbade Moran from coming to his home, Thomas would "sometimes, yes, sometimes, no" allow Moran to come over when her father was not at home.

Thomas's father testified that he forbade Moran from coming to his home after he saw a "change in his behavior." Specifically, "[a] lot more arguing, a lot more in-your-face-type arguing, up close and personal . . . Situations prior with the law in which situations happened between the two of them that obviously that wasn't good."

1. Moran contends insufficient evidence supports his convictions.

(a) Moran claims the State failed to present sufficient evidence to support his stalking conviction because Thomas never testified that she was in fear for her safety or intimidated by his behavior, there was no evidence that his contact with her was without her consent, and he had a legitimate purpose for communicating with her based upon their "anticipated plans" and "the nature of their relationship."

The indictment charged that Moran "follow[ed] and place[d] under surveillance and contact[ed] . . . Thomas at a place, to wit: [her father's address where she resided], without the consent of . . . Thomas, for the purpose of harassing and intimidating . . . Thomas." "A person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places[1] without the consent of the other person for the purpose of harassing and intimidating[2] the other person." OCGA § 16-5-90 (a) (1). "A defendant need not engage in unequivocally hostile conduct or make explicit threats in order to be

---

[1] "Place or places" is defined as "any public or private property occupied by the victim other than the residence of the defendant." OCGA § 16-5-90 (a) (1).

[2] "Harassing and intimidating" is defined as "a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose." OCGA § 16-5-90 (a) (1).

6

convicted of stalking. Even behavior that is not overtly threatening can provide the requisite degree of intimidation and harassment if is it ongoing, repetitious, and engaged in despite the communicated wishes of the victim." *Placanica v. State*, 303 Ga. App. 302, 304 (693 SE2d 571) (2010).

After carefully reviewing the evidence, we agree that the State failed to present sufficient evidence that Thomas was placed in reasonable fear for her safety, an essential element of stalking. See *Crapps v. State*, 329 Ga. App. 820, 823-824 (1) (766 SE2d 178) (2014). As in *In the Interest of C. C.*, 280 Ga. App. 590, 591-592 (1) (634 SE2d 532) (2006), there was no evidence that Thomas was afraid or had any emotional distress. See also *Wright v. State*, 292 Ga. App. 673, 676 (665 SE2d 374) (2008) (insufficient evidence to support aggravated stalking conviction because no evidence that victim in reasonable fear for her safety during multiple phone conversations with defendant). While there was evidence that Thomas was "a little bit" afraid of Moran during a previous argument, there was no evidence showing that she was afraid for her safety from the charged conduct. We therefore reverse his conviction for stalking.

(b) Moran asserts generally that the State failed to introduce sufficient evidence of intent with regard to his aggravated assault, aggravated battery, burglary, and

possession of a knife during the commission of a felony. We disagree. The record contains ample evidence of intent, and "the intent to commit a felony necessary for the burglary conviction need not be formed at the precise moment of entry, but can be formed while the perpetrator is remaining on the premises. [Cit.]" *Waters v. State*, 294 Ga. App. 442, 443 (1) (669 SE2d 450) (2008).

2. Moran asserts that trial counsel was ineffective in failing to request a pre-trial hearing to determine whether he was immune from prosecution on the ground of self-defense. In ruling on a claim of ineffective assistance,

> [u]nder the two-part test established in *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984), [Moran] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong.

(Citations and punctuation omitted.) *Harrison v. State*, 313 Ga. App. 861, 865 (3) (722 SE2d 774) (2012).

> As a general rule, reasonable trial tactics and strategies do not amount to ineffective assistance of counsel. The decisions on which witnesses to call and all other strategies and tactical decisions are the exclusive province of the lawyer after consultation with his or her client. Whether

8

an attorney's trial tactics were reasonable is a question of law, not fact. When assessing the reasonableness of counsel's actions, a court must evaluate counsel's performance from his or her perspective at the time of trial. This Court reviews a trial court's ruling on an ineffective assistance claim on appeal by accepting the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. [Cits.]

*Hughley v. State*, 330 Ga. App 786, 791 (4) (769 SE2d 537) (2015). And

we are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct. If a reasonable lawyer might have done what the actual lawyer did — whether for the same reasons given by the actual lawyer or different reasons entirely — the actual lawyer cannot be said to have performed in an objectively unreasonable way.[Cit.]

Id. at 791-792 (4).

Here, trial counsel testified that he did not request an immunity hearing because he did not want to subject Moran to cross-examination before trial and "there were some questions [he] wanted to ask [the victim] . . . for the first time in front of a jury." Additionally, he did not believe a motion for immunity based upon self-defense would have been successful. As counsel did not employ an objectively unreasonable trial strategy, we affirm the trial court's denial of Moran's ineffective assistance of

counsel claim. See *Boddie v. State*, 327 Ga. App. 667, 670 (1) (760 SE2d 668) (2014) (no ineffective assistance where trial counsel did not make unreasonable strategic decision against filing a pre-trial motion).

*Judgment affirmed in part and reversed in part. Doyle, C. J. and Phipps, P. J., concur.*